[No. A043289. First Dist., Div. Three. July 27, 1990.]

NORA TIBBETTS, Individually and as Executrix, etc., Plaintiff and Respondent, v.
JOHN K. VAN DE KAMP, as Attorney General, etc., et al., Defendants and Appellants.

COUNSEL

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Morris Beatus, Ann K. Jensen and Enid Camps, Deputy Attorneys General, for Defendants and Appellants.

Ernst, Coyle & Lachowicz and Patrick Coyle for Plaintiff and Respondent.

Barash & Hill, Jerry M. Hill and Alexander H. Pope as Amici Curiae.

OPINION

STRANKMAN, J.—

I. *Synopsis*

Is the poker card game known as "Texas Hold'em" a form of "stud-horse poker" proscribed by Penal Code section 330?[1] By her complaint for, inter alia, declaratory relief, respondent Nora Tibbetts, individually and as executrix of the estate of J. C. Tibbetts, deceased, doing business as the Oaks Card Room, a sole proprietorship,[2] asserted that the term "stud-horse poker" referred to a specific form of five-card stud poker popular in California casinos in the 1880's, that Texas Hold'em is entirely separate and distinct from such game, and therefore is not prohibited by section 330.

---

[1] All further statutory references are to the Penal Code unless indicated otherwise.

[2] Respondent Nora Tibbetts is the owner of an Emeryville card room known as the Oaks Card Room, duly licensed as a card club with the State of California and operating pursuant to a gaming ordinance of the City of Emeryville. On December 8, 1987, respondent's counsel was advised by appellant James M. Watson, manager of the State Gaming Registration Program, that the Attorney General of the State of California considered Texas Hold'em to be prohibited by section 330. On that same date respondent terminated the playing of Texas Hold'em at the Oaks Card Room, and this action ensued.

Appellants[3] contend that stud-horse poker embraces a broad category of poker games loosely defined as "stud poker," relying on a published opinion of the Attorney General pertaining to section 330, which states: "[I]t is our conclusion that 'stud-horse poker' is identical with 'stud-poker.' [¶] . . . '[S]tud-poker' is a variation of poker, in which the first card is dealt face down to each player and the remaining four cards are dealt face up. After each card is shown, bets are made by placing the amount of the bet in a pot. The winning hand takes the pot. There are numerous variations of stud poker. Frequently, the game is played with seven cards. Likewise, there are variants in the practice of betting." (9 Ops.Cal.Atty.Gen. 108 (1947).) Appellants further contend that Texas Hold'em (described below), in which certain cards are dealt face up, falls within the category of stud poker games, and therefore is prohibited by section 330.

Following trial, the trial court ruled in favor of respondent, finding that stud-horse poker was a game that could be specifically identified and thus was not unconstitutionally vague; that Texas Hold'em was a form of poker that had a history and origin separate and distinct from that of stud-horse poker; and that Texas Hold'em differed substantially from stud-horse poker as historically described in that it had differences in format, strategy, and visual appearance. The court therefore concluded that Texas Hold'em did not fall within the definition of stud-horse poker proscribed by section 330.

The definition of stud-horse poker, which has never been legislatively or judicially defined since its prohibition in 1885, remains uncertain, as noted by one commentator: "The primary source of California's poker law lies in an 1885 amendment to section 330 prohibiting the playing of one form of poker, stud-horse poker. Unfortunately, the legislature failed to describe the game, and today, more than 100 years later, stud-horse poker is no longer played (at least, not by that name) and an uncontroverted meaning of the term is lost in time." (Note, *Where Will the Buck Stop on California Penal Code Section 330?: Solving the Stud-Horse Poker Conundrum* (1988) 11 Hastings Comm. & Ent. L.J. 95, 96, fn. omitted (hereafter *Stud-Horse Poker Conundrum*).)

We conclude that whether stud-horse poker refers to a specific card game played in the 1800's or encompasses a broader category of stud poker games played today, Texas Hold'em is not a form of stud-horse poker proscribed by section 330. We therefore affirm.

II. *Section 330 and Legislative Background*

Section 330, originally enacted in 1872, declares guilty of a misdemeanor "[e]very person who deals, plays, or carries on, opens, or causes to be

---

[3] Appellants are John K. Van de Kamp, Attorney General of the State of California; James M. Watson, Gaming Registration Program Manager; John J. Meehan, District Attorney of the County of Alameda; and Joseph Colletti, Chief of Police of the City of Emeryville.

opened, or who conducts, either as owner or employee, whether for hire or not, any game of faro, monte, roulette, lansquenet, rouge et noire, rondo, tan, fan-tan, stud-horse poker, seven-and-a-half, twenty-one, hokey-pokey, or any banking or percentage game played with cards, dice, or any device, for money, checks, credit, or other representative of value, and every person who plays or bets at or against any of said prohibited games . . . ."

■ Section 330 thus proscribes certain specifically identified card and gambling games, as well as "any banking or percentage game."[4] (A banking game is one in which the " 'house' " or " 'bank' " is the principal participant in the game, taking on all players, paying all winners and collecting from all losers. A percentage game is one in which the " 'house' " does not directly participate in the game, but collects a percentage from it which may be computed from the amount of bets made, winnings collected, or the amount of money changing hands. (*Sullivan* v. *Fox* (1987) 189 Cal.App.3d 673, 678-679 [235 Cal.Rptr. 5].)) Thus, a card game played for money not specifically listed under section 330 and not played as a banking or percentage game is not prohibited. (See *In re Hubbard* (1964) 62 Cal.2d 119, 126 [41 Cal.Rptr. 393, 396 P.2d 809]; *Monterey Club* v. *Superior Court* (1941) 48 Cal.App.2d 131, 148 [119 P.2d 349]; 9 Ops.Cal.Atty.Gen., *supra,* at p. 109.)

At trial, the parties' gaming experts testified as to the historical background of section 330. Respondent's expert testified that the common thread among the games specifically listed in section 330 at the time of its enactment was that they were casino games, i.e., banking or percentage games, which were deemed especially "suspect" because, among other reasons, the house had an advantage and limitless funds.

"Stud-horse poker" was added to the specific list of proscribed games in an 1885 amendment to the statute. (Stats. 1885, ch. 145, § 1, p. 135.) Section 330 does not itself define stud-horse poker. The legislative record reveals no committee reports or official statements regarding the 1885 amendment. At trial, the court admitted into evidence newspaper articles published in the 1880's pertaining to stud-horse poker, which describe stud-horse poker as a form of five-card stud poker (similar to that described in the 1947 opinion of the Attorney General, quoted *ante*), but played as a percentage game. The article states: "Of course the bank steadily eats a large hole in the purchased chips, the percentage being certain, and much greater than 'splits' in a square game of faro."

III. *Different Categories of Poker Games; Texas Hold'em*

■ Appellants argue there are only two broad categories of poker—draw poker with no exposed cards, and stud poker with exposed cards—

---

[4] At trial, it was stipulated that the poker game Texas Hold'em as played at the Oaks Card Room is not a banking or percentage game.

and that section 330's prohibition of stud-horse poker makes illegal all forms of poker except draw poker.

Respondent's evidence adduced at trial, however, as well as our own research establish there are several different recognized categories of poker games, including: (1) straight poker where five cards are dealt each player face down and no cards are drawn; (2) draw poker in which players may improve their hands by discarding one or more cards and replacing them with others drawn from the deck; (3) stud poker where each player is dealt certain cards face down and additional cards face up, with no draw; and (4) community card poker, otherwise known as "Spit-in-the-Ocean," which is "a large family of games embracing a common essential feature: Each player combines the cards dealt to him with one or more cards exposed on the table and thus automatically made part of the hand of every player." (See Morehead, The Complete Guide to Winning Poker (1967) p. 188; see *Stud-Horse Poker Conundrum,* 11 Hastings Comm. & Ent. L.J., *supra,* at pp. 98-103.)

Poker authorities generally are in accord with respondent's designation of Texas Hold'em as included in the community card category, which is distinct from that of stud poker: "[T]he relatively new hybrid game of hold'em [is] perhaps the most challenging poker game of all. Neither draw nor stud, hold'em belongs to the family of poker games known as spit-in-the-ocean, in which players are dealt individual cards, but also share communal cards dealt face up in the center of the table. In hold'em, each player is dealt two 'hole cards' [cards dealt face down] followed by a betting round. After the players bet, call, or fold, three communal cards, called the flop, are placed face up in the middle of the table. Each player is entitled to combine one or more of these cards with their own individual two-card hand. After the flop, there is another betting round, followed by the deal of a fourth and fifth communal card to the center of the table. There is a third and then a final betting round after each of these last two cards are dealt. The winner is the player who can create the best hand by combining their hole cards with as many of the communal cards as they choose to use." (*Stud-Horse Poker Conundrum,* 11 Hastings Comm. & Ent. L.J., *op. cit. supra,* at pp. 102-103, fns. omitted.)

Another poker commentator notes: "I don't think you can find a game more filled with excitement, or one that involves a greater element of luck, and yet demanding that you do some damn smart figuring if you want to succeed as a hold'em player. [¶] In hold'em, no hand is a mortal cinch to win until that last card falls. In fact, what started as the best hand may end up being the worst because of the many combinations possible in this intriguing game. . . . [¶] It's a simple game to play, but a complex one to master." (Preston & Cox, Play Poker to Win (1973) p. 76.)

At trial, respondent's gaming expert testified as to the numerous differences between five-card stud poker and Texas Hold'em, including different mathematics, different odds, different strategies, different betting opportunities and sequence, the number of private cards held by each player and, of course, the community card aspect of Texas Hold'em.

## IV. *Analysis*

The interpretation of the provisions of section 330 is a question of law to be determined independently by this court. (See *People* v. *Carroll* (1889) 80 Cal. 153, 156-157 [22 P. 129]; *Sullivan* v. *Fox, supra,* 189 Cal.App.3d at p. 678.) In making this determination, we follow a fundamental rule of construction of criminal statutes: "A penal statute should not be interpreted to cover an alleged offense which is not plainly within its terms." (*Mains* v. *Bd. of Barber Examiners* (1967) 249 Cal.App.2d 459, 466 [57 Cal.Rptr. 573].) We also heed the comment of the California Supreme Court on the scope of section 330's proscriptions: "[The Legislature] clearly indicated that it recognized the existence of other gambling games not included in the prohibition of the code section. . . . [In considering other legislation] it becomes obvious that 330 was intended to ban betting or wagering only in regard to a limited number of games." (*In re Hubbard, supra,* 62 Cal.2d at p. 126.)

The first issue is whether, as appellants contend, the term stud-horse poker refers to stud poker, and, if so, whether stud poker embraces all forms of poker other than draw poker.

The legislative history of section 330 and the historical circumstances of the 1885 amendment indicate (though not definitively)[5] that the term stud-horse poker referred, at the time of the amendment, to a form of five-card stud poker similar to that described in 9 Ops.Cal.Atty.Gen. 108, *supra,* but, unlike today, played as a percentage game.

However, even if stud-horse poker is deemed synonymous with five-card stud poker and its variations as played today, the authorities and expert testimony discussed above establish there are several different recognized categories of poker, each having its own distinct format and strategy, and that stud poker is but one such category. By its own explicit terms, section 330 proscribes stud poker, and no other category of poker games.

---

[5] The legislative history as presented by the parties is far from definitive as it is based largely upon newspaper articles. Generally, newspaper articles are inadmissible to prove their contents because of the hearsay rule (*Stoneking* v. *Briggs* (1967) 254 Cal.App.2d 563, 576 [62 Cal.Rptr. 249]), and should not be authority for the definition of criminal offenses.

The second issue is whether, as appellants contend, the game or category of games of stud poker embraces the game of Texas Hold'em. We conclude the authorities cited above and expert testimony likewise establish that Texas Hold'em falls within a separate category of card games known as "community" or "Spit-in-the-Ocean," recognized by poker authorities as distinct from stud poker in numerous respects. Accordingly, Texas Hold'em does not fall within the stud poker category.

Were we to follow appellants' argument that any game involving exposed cards falls within the category of stud poker, we would need to find that all card games with exposed cards which have evolved since 1885 and which continue to evolve are prohibited. Such result is not warranted by the legislative history of the 1885 amendment, discussed above, which indicates that the house percentage aspect of the game, not the face exposure of cards, was the element considered morally, socially, and otherwise dangerous and objectionable. ■ Such result would also be contrary to fundamental rules of construction of criminal statutes: " '. . . We cannot create . . . an offense by enlarging the statute, or by inserting or deleting words, nor should we do so by giving a false meaning to its words. [Citations.] Such a practice makes it impossible for anyone to rely on the written word of the Legislature . . . .' " (*People* v. *Baker* (1968) 69 Cal.2d 44, 50 [69 Cal.Rptr. 595, 442 P.2d 675].)

For the foregoing reasons, we conclude that the poker game known as "Texas Hold'em" is not a form of stud-horse poker proscribed by section 330.

We note that the regulation of gambling in general and of poker games in particular in California is a matter for the Legislature, not the judiciary. The continuing uncertainty arising from the stud-horse poker proscription in section 330 may be alleviated by appropriate legislation.

## V. *Disposition*

The judgment is affirmed.

White, P. J., and Merrill, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 18, 1990. Lucas, C. J., and Mosk, J., were of the opinion that the petition should be granted.